JOHN G. TURNBOW, Respondent, v. MARTIN A. BECKSTEAD and THE UTAH COMMERCIAL & SAVINGS BANK, a Corporation, Appellants.

No. 1377.   (71 Pac. 1062.)

1. Contracts: Construction: Sale: Lease: Transfer of Title:
Plaintiff and his assignors entered into contracts with defendant's transferror, stating, in substance, that the transferror had leased from plaintiff or his assignors certain sheep for the term of two years, for which he agreed to pay a certain yearly rental, and keep the old stock good.   *Held*, that the contract was one of lease, not of sale, and did not pass title.[1]

2. Same: Rights of Lessee Under Contract: to Sell.
Under a contract providing that the lessee of sheep should "keep the old stock good," which expert testimony showed to mean that the same number, ages, and quality of sheep were to be returned

---

[1] Woodward v. Edmunds, 20 Utah 118; 57 Pac. 848.

as had been taken, the lessee was authorized to sell the old sheep, and let younger ones take their places, but not to sell the entire herd.[2]

**3. Same: to Brand: Intention to Pass Title.**

In a contract leasing sheep, the fact that the lessee placed his brand upon the sheep for the purpose, as the lessee testified, of distinguishing them from other sheep running with his herd, did not show an intention to pass title.

**4. Same: Purchase From Transferee: Possession Not Conclusive of Ownership.**

Possession of personal property by one not the owner will not protect a purchaser from him against the claims of the owner.[3]

**5. Same: Identity of Goods: Evidence: Sufficiency.**

In replevin for sheep wrongfully sold by lessee, the evidence held sufficient to support a finding that the sheep in possession of defendant were those subject to the lease.

**6. Same: Appeal: Findings: Not Disturbed, When.**

Where there is competent evidence to sustain a finding, the question of the weight of the evidence will not be reviewed on appeal.[4]

(Decided April 1, 1903.)

Appeal from the Third District Court, Salt Lake County.— *Hon. S. W. Stewart*, Judge.

Action to recover the possession of fourteen hundred and thirty head of sheep, their wool and increase, or the value thereof. From a judgment in favor of the plaintiff, the defendants appealed.

AFFIRMED.

*C. S. Price, Esq.*, and *Messrs. Bennett, Sutherland, Van Cott & Allison* for appellants.

---

[2] Woodward v. Edmunds, 20 Utah 118; 57 Pac. 848.

[3] Russell v. Harkness, 4 Utah 197; 7 Pac. 865; Harkness v. Russell, 7 Sup. Ct. 51; 118 U. S. 663; 30 L. Ed. 285.

[4] Kennedy v. Railroad Co., 18 Utah 325; 54 Pac. 988.

The transactions by which the sheep were delivered to Jones were sales and not bailments. We direct especial attention to the language of all of the contracts under which Jones received sheep from these various parties. Without exception they contain a covenant obligating Jones to "keep the old stock good," and in addition thereto he agrees either to pay a certain annual money consideration, or a designated quantity of wool and number of lambs annually for the possession and use of the sheep. We insist that all of the contracts are contracts of sale and not of bailment, and that upon delivery of the sheep to Jones under the contracts, the title thereof passed immediately to Jones accompanied by the power to dispose of them, and at the same time making them subject to the claims of his creditors. There is no covenant in the contracts requiring Jones to return the identical sheep received by him; but, on the contrary, the expression "keep the old stock good" necessarily implies that he could only be required to return other sheep of the same kind, quality and value. Where a party receiving property is at liberty to return another thing of equal value, either in the form of money or otherwise, he then simply becomes a debtor to make the return, the title to the property is changed, and the transaction is a sale. This is the universal rule sustained by an overwhelming array of authorities. Carpenter v. Griffin, 9 Paige Ch. Rep. (N. Y.) 309; Hurd v. West, 7 Cowen 752; Fosdick v. Greene, 27 Ohio St. 484; Chase v. Washburn, 1 Ohio St. 244; Carlisle v. Wallace, 12 Ind. 252; Richardson v. Olmstead, 74 Ill. 213; Johnson v. Browne, 37 Iowa 200; Chickering v. Bastress, 130 Ill. 309; s. c., 17 Am. St. Rep. 309; Lonergan v. Stewart, 55 Ill. 44; Rahilly v. Wilson, 3 Dill. 420.

The plaintiff and his assignors are estopped from disputing Jones' title to the sheep. The rule is well settled that one who clothes another with the apparent ownership of property is estopped from disputing the title as against one who

has dealt with the apparent owner upon the strength of the appearances if the person so dealing has altered his position to his injury.    Salters v. Everett, 20 Wend. 268; McMurray v. Hughes, 47 N. W. 883; McNiel v. Bank, 46 N. Y. 329; McCauley v. Brown, 2 Daly 426; Ewing v. French, 1 Blackf. 353; Wilson v. Finney, 13 Johns. 358; Lonergan v. Stewart, 55 Ill. 44; Johnston v. Beaver, 37 Iowa 200; Nelson v. Brown, 44 Iowa 455; Mallory v. Nillis, 4 N. Y. 76; Greening v. Elliott, 38 La. Ann. 290; Rogers v. Robinson, 104 Mich. 329; S. C. 62 N. W. 402; Peabody v. Lloyd's Bankers, 68 N. W. 92; Jandon v. Goordin's Ex'rs, 1 Rich. Eq. Cas. 246; Neale v. Searles, 31 Tex. 105.

Where domestic animals are leased, unless there is a stipulation to the contrary, the natural increase thereof during the continuance of the lease belongs to the lessee.    Gooth v. Everett, 16 Mo. 490; Stewart v. Ball, 33 Mo. 154; Putnam v. Nyley, 8 Johnson (N. Y.) 432; S. C. 5 Am. Dec. 346; Concklin v. Hovens, 12 Johnson (N. Y.), 314; White v. Storms, 20 Mo. App. 288.

Under the admitted facts in this case replevin cannot be maintained.    From the very nature of the action the state of facts existing at the commencement of the action must control its determination.    In replevin the question is who was entitled to the property when the action was begun.    No change in the conditions after suit was brought will enable the plaintiff to maintain the action if he could not maintain it when the action was commenced.    And it is the uniform rule that in this class of cases, the plaintiff must stand or fall on the facts as they exist when the suit was commenced. Cory v. Hewitt, 26 Mich. 228; Aber v. Bratton, 60 Mich. 357; Kingsbury v. Bratton, 11 Iowa 387; Campbell v. Millions, 39 Iowa 346; Bartlett v. Goodwin, 71 Me. 350; Hoke v. Applegate, 92 Ind. 570; Loomis v. Youle, 1 Minn. 175; Blue Valley Bank v. Bane, 20 Neb. 294; Pitts v. Hale, 3 Mass. 321; Lovensohn v. Word, 45 Cal. 8.

And the primary object of the action in replevin is to recover the property in specie. Herdic v. Young, 55 Pa. St. 176; Hickey v. Huisdale, 12 Mich. 99; Clark v. West, 23 Mich. 242; Hunt v. Robinson, 11 Cal. 262; Hamilton v. Clark, 25 Mo. App. 428; Paul v. Luttrell, 1 Colo. 317.

*Messrs. Ferguson, Cannon & Tanner* for respondent.

### STATEMENT OF FACTS.

Plaintiff delivered to one John S. Jones 450 head of sheep under the following agreement:

"This is to certify that I, the undersigned, have leased from John G. Turnbow, of Kamas, Summit county, Utah, 450 head of sheep (four hundred and fifty head of sheep), for which I agree to give 50c. per head per year for two years, and keep the old stock good.

"JOHN S. JONES.

"Dated at Kamas, Summit county, Utah, Sept. 22, 1899. Term ending Sept. 22, 1901. Rent to be paid after wool is disposed of after shearing.          J. S. J."

Plaintiff also claims as assignee of Arthur Bennion and L. J. and Lewellyn Mantle, who delivered sheep to said Jones; the former under the following agreement:

"Kamas, Summit county, Utah.

"This is to certify that I, the undersigned, have received from R. J. Bennion, guardian (334), three hundred and thirty-four head of sheep belonging to Arthur Bennion, for which I agree to give one and one-half pounds of wool per head and eight lambs on the hundred and keep the old stock good for one year.

"JOHN JONES.

"Dated at the above named place October 3, 1896."

This contract was renewed from year to year until the following agreement was entered into:

"Kamas, October 1, 1900.
"This is to certify that I, the undersigned, have leased from Arthur Bennion for the term of two years, for which I agree to pay 40c. per head per year and keep the old stock good, 450 head of sheep.

"JOHN JONES."

The Mantle sheep were taken by Jones at the same time as the Bennion sheep, and kept until October 1, 1899, when agreements substantially the same as the last above mentioned were executed—one to J. L. Mantle, for 130 head of sheep, and one to Lewellyn Mantle, for 400 head of sheep; each for the term of two years. All these sheep were run together, and, with the consent of the plaintiff, as to his 450 head, Jones placed his brand on the sheep in order to identify them in case they got mixed up with other sheep, and to prevent confusion of marks. Jones being indebted to the defendant bank on two promissory notes—one for $500 and one for $3,000—as security for the payment of same gave to defendant bank a bill of sale for 2,000 head of sheep, which included the 1,430 head claimed by plaintiff. Said bill of sale was given under these circumstances: The bank had a mortgage on another herd of sheep to secure the payment of said $3,000 note, which sheep Jones had previously purchased from defendant Beckstead. Upon which a part of the purchase price remained unpaid. These sheep upon which the bank held said mortgage were shipped to Chicago by Jones, and sold for $7,400, and that amount was remitted to the defendant bank. Jones informed the cashier of said bank that he was going to ship some Beckstead sheep, but the cashier testifies that he supposed Jones was going to ship some other sheep for Beckstead, and did not learn that they were the mortgaged sheep until some

time after receiving the said remittance and applying about
$1,500 in settlement of an overdraft account Jones had with
the bank, and permitting a part, if not all, of the balance
of the remittance to be checked out by Jones. The cashier
of defendant bank testified that, after learning of the sale of
the mortgaged sheep: "I demanded of Mr. Jones that he
make good the security upon that $3,000 note which he had
sold without the consent of the bank. He asked me what I
wanted, and I said, 'You have your herd of sheep out at
Kamas,' and Jones said, 'Yes.' I said, 'Let me see, there are
some 2,000 head?' He said: 'Yes, sir; somewhere near.
There may be one or two less or one or two more.' I said,
'Possibly we could take a chattel mortgage upon the herd at
Kamas, and substitute it for the chattel mortgage on the herd
you have sold.' Jones said, if that could be done, he was will-
ing to make such a mortgage." After consulting an attorney,
an absolute transfer was demanded and executed. The sheep
were not present at the time said bill of sale was given the
bank. Jones furnished the information as to the marks and
brands upon the herd. Jones testifies that the bill of sale
to the bank was given by way of security for the indebtedness,
and this is borne out by the subsequent proceedings in relation
thereto. The bill of sale and the said notes were assigned by
the bank to Beckstead, apparently for the purpose of collection,
and he afterwards brought suit thereon, and obtained judg-
ment against Jones on two said two promissory notes and upon
the indebtedness of Jones to Beckstead in the sum of $6,-
286.80, upon which Beckstead procured an execution to is-
sue. A levy upon and sale of the said sheep which Beckstead
had taken into his possession under the said bill of sale was
had. The plaintiff herein was not made a party to the suit
foreclosing said bill of sale. The court, among other matters,
found that at the time the said Beckstead took into his pos-
session the said sheep (about November 1, 1900), the defend-
ants had due and timely notice then or prior thereto that the

plaintiff and other persons claimed and intended to claim a right and interest in the sheep so taken. The evidence upon this point is conflicting, but is supported by the following testimony of John L. Jones, the sheep herder, who was present when the sheep were turned over to Beckstead: "I don't remember just what I did say to Mr. Beckstead. I told him they were share sheep, and I did not see how that he could take them." Mrs. Rhoda J. Bennion testified to a conversation with Beckstead in reference to her son John Jones buying sheep in June or July, before the sale, in part as follows: "He says: 'My sheep is for sale. I would like to have him take them.' I says, 'Mr. Beckstead, that boy can't do it.' I says, 'He has no means to back him.' I says, 'These sheep that he has got, I have got myself to put up provisions to keep the sheep wagon going.' That the sheep belonged to the boy that I was guardian for, but I had turned them over then. . . . That is the words I said to Mr. Beckstead. Mr. Beckstead went along, and never said a word."

HART, District Judge (after stating the facts).—The principal question involved in this appeal is whether these agreements are contracts of sale passing to Jones title to the sheep, or whether they are mere leases. As was said by this court in the similar case of Woodward v. Edmunds, 20 Utah 118, 125, 126, 57 Pac. 848: "There are no words of sale in the instrument, no language whatever showing a transfer of title, or a provision to pay for the property. Nor does the language employed indicate that it was the intenton of the parties that the transaction should be a sale of the property." Both parties hereto rely upon the rule that, "where there is ambiguity in a contract, a practical construction given it by the parties before the controversy arose should be adopted by the court," and each insists that his position is strengthened by the evidence in the light of this rule. In this connection there is the testimony of Jones: "I didn't claim

to be the owner. I never paid anything for them, only just as dividends on them." Also the testimony of Jones and Arthur Bennion that the increase belonged to Jones. But all such testimony is largely in the nature of conclusions. There is some testimony that plaintiff's assignors consented to Jones branding the sheep with his own brand, although the finding of the court is to the contrary. At least Bennion knew that his sheep had been so marked; but it appears he was a minor at that time.

Considerable expert testimony was taken as to the meaning of the expression in such a contract, "keep the old stock good." Heber Bennion, an expert called for the plaintiff, testified that he understood by this phrase that the number was to be kept good out of the increase of the old sheep, and this was considered a partial guaranty of the quality of the animals because a product of the old sheep; but that, if the increase were not enough to make up for a loss of the old sheep, that sheep from some other source as near the same quality as possible should make up the number. Other experts testified that the expression "keep the old stock good" means that the same number and quality and ages are to be returned as has been taken out, but not necessarily the same sheep or their increase. Neither the plaintiff nor his assignors expressly authorized Jones to sell any of the sheep, nor were any of them present when any sheep were sold by Jones, although L. J. Mantle testified that they understood that some of the sheep were being disposed of, but the time he so learned does not appear. It may be a fair inference from all the testimony that under a contract such as this to "keep the old stock good" Jones was authorized to do so by disposing of the old sheep, and letting younger ones take their places; but that would not authorize him to sell the entire herd. There can be no question but that the 1,430 sheep claimed by plaintiff are the original sheep and their increase; mostly the latter. In the Woodward case, supra, this court said:

"The mere facts that the lessee was to pay the rental in wool and a certain portion of increase, and at the expiration of the term to deliver for the original number of sheep a 'fair cut of the herd or herds,' are not sufficient under the circumstances to show that the parties intended a sale. . . . But, even if the time and duration of the contract had been such that a natural increase of the flock might have been expected, still the facts are not such as would warrant the court in finding and holding that the transaction was an absolute sale." In the above-named case the sheep were all marked with the lessor's permanent mark, and the contract contained an express provision that no sheep should be disposed of without the consent of the lessor. In view of all of the circumstances of the case at bar, we are not inclined to attach much significance to the fact that Jones' brand was placed upon the sheep; neither as to the question of intention to pass title, nor upon the defense of estoppel. The explanation of the circumstances of placing the lessee's marks on plaintiff's 450 sheep shows that the parties did not intend thereby to pass title. The case of Russell v. Harkness, 4 Utah 197, 204, 7 Pac. 865, affirmed, Harkness v. Russell, 118 U. S. 663, 7 Sup. Ct. 51, 30 L. Ed. 285, shows that possession of personal property by one not the owner is by no means conclusive of ownership as against a third party. This court, speaking by Chief Justice Zane, in that case said: "The courts of Illinois and some other States hold that conditional sales of the class involved in this case are invalid as against creditors and purchasers of the conditional vendee. The purpose of the rule is to prevent fraud. The argument against such sales is that possession of personal property is evidence of ownership, and to intrust persons with that evidence without the title gives them the means of defrauding and imposing upon others. This argument may also be made against loans, bailments, and leases of personal property. But it has been uniformly held that the purchaser of the borrower, the bailee,

or lessee takes subject to the rights of the vendor or the bailor or the lessor. . . . Every person competent to contract is presumed to know that possession alone is not sufficient to confer title as against the owner, and, if the purchaser relies upon it without inquiry, he does it at his peril. The law construes contracts according to the intention of the parties, and allows them to contract with whomsoever and upon whatever terms they may desire."

We do not see that the defendants occupy any better position in this case than Jones himself would. The entire proceeds of the sale of the mortgaged sheep were remitted to the bank, and $1,500 thereof were applied in payment of Jones' account. If said sheep sold for their market value (and that is a fair presumption), the bank would have gained nothing by refusing to ratify the sale. The bank got the money, and it does not appear that its position was less favorable as to revoking said sale at the time Beckstead, for the bank, took possession of the sheep, and was informed that they were share sheep, than at any time prior thereto and after discovery of sale of the mortgaged herd. We do not think plaintiff is estopped from making the same claim against defendant that he could make against Jones. While this case differs in some of its facts from the cases of Woodward v. Edmunds, supra, Robinson v. Haas, 40 Cal. 475, and Bellows v. Denison, 9 N. H. 293, we are inclined to the view that the principle of those cases is controlling in this.

Appellants contend that plaintiff was not entitled to recover in replevin in any event, for the reason that there were sheep in the herd other than those claimed by the plaintiff. The finding of the court upon this point is: "That the said 1,430 head of sheep were and are all of the herd now held by the said defendant Martin A. Beckstead, except those in said herd claimed by Jared C. Homer, said Homer's sheep being marked and described as follows, to-wit, all the sheep marked crop off right ear, upper and under bit

in the same, and under bit in left ear." This finding is supported by the testimony of John L. Jones, as follows: "I was at John A. Sharp's, in this county, when 2,076 head of sheep were turned over to Beckstead. Seventy-six head belonged to Sharp, and about 500 head were marked with Homer's brand. . . . The sheep that were turned over to Mr. Beckstead, except those that had the Homer brand on them and the Sharp brand, are the same sheep that were originally leased by Mantle and Bennion and Turnbow, and their increase. There were no other sheep than those original sheep and their increase in that herd, except Homer's, and 76 head of Sharp's." John S. Jones also testified that besides Sharp's sheep, placed by the witness at 64 or 67, Homer turned into the herd 800, and took out 167 or 197, and that about 50 died. He said: "There were enough, besides Sharp's and Homer's to make up the number of Lewellyn and L. J. Mantle's, John J. Turnbow's and Arthur Bennion's." If Sharp's and Homer's sheep were distinguishable from the other sheep, and besides there were no more than 1,430, we cannot perceive wherein there was any tenancy in common of the 1,430 sheep with other sheep. In all there were 2,076 sheep, from which deduct 1,430, and there are left 646, which would allow 76 for Sharp and only 570 for Homer, while he had 583, if the number withdrawn by him from the herd was 167.

Complaint is also made of the value placed upon the property in the alternative judgment in case the sheep could not be redelivered. As there is some competent testimony to sustain the finding of the court as to value, this court is not at liberty in a law action, such as this, under the well-established rule in this jurisdiction, to review the weight of the evidence upon this question. Kennedy v. O. S. L. R. R. Co., 18 Utah 325, 54 Pac. 988.

Upon plaintiff's supplemental complaint for the recovery of the wool sheared by defendants from the sheep claimed in the original complaint and for the increase from said

sheep, the trial court found the value of such wool to be $815.82, and the value of the lambs $656.35. A deduction was also made defendants from the total judgment of $125.10, costs of shearing and disposing of said wool, and $1,000 for the care of said sheep, with interest thereon from September 21, 1901. We do not feel called upon to decide the rule of damages or value in a case of this kind, for the reason that it is evident that the judgment given is quite as favorable to defendants as it would be if any legal method of computing value or damages were applied, under the testimony in this case. Interest on the value of the sheep at eight per cent. from the time of taking to the time of judgment exceeds the net amount allowed for wool and increase.

An order may enter affirming the judgment of the trial court, with costs to plaintiff.

BASKIN, C. J., and BARTCH, J., concur.