# RICH v. UTAH COMMERCIAL & SAVINGS BANK.

No. 1692.   Decided April 18, 1906 (84 Pac. 1105).

1. EVIDENCE—OPINIONS—COMPETENCY OF EXPERTS.—In an action for the conversion of sheep, witnesses who were sheep men and had been in the sheep business for years, and who testified that they knew the market value of sheep in the state, some of them knowing the sheep in question, others testifying that the market value of sheep in the state was determined by the market reports and prices as made and obtained in Chicago, were competent to testify to such market value, though on cross-examination they stated that they did not know of any sales having been made at the place where the sheep were grazed at or about the time of the alleged conversion, and some of them also stated that they knew the value of the sheep by inquiring as to their value at that time.

2. TROVER AND CONVERSION—SUFFICIENCY OF EVIDENCE.—In an action for the conversion of sheep, evidence examined, and *held* sufficient to support a judgment for plaintiff.

3. SALES—BAILMENT AND SALE DISTINGUISHED.—An agreement for the leasing of sheep purported on its face to be a lease, among other things expressly providing that the title to the sheep and their increase should remain in the lessors; that the lessees were to keep and care for the sheep up to a certain date, when they were to be returned to the lessors, according to the lease, provision being made therein as to the kind of brand with which the flock was to be branded, the lessees agreeing to return to the lessors the number of sheep received and in the same condition, grade,

quality and age, and to pay a certain amount of wool and a certain number of lambs per year as rental. It was also declared that the agreement was a personal contract with the lessees, and not assignable or transferable by them in any way without the lessors' consent, and the lessors were authorized to take possession of the sheep if in good faith they believed that their interests were being jeopardized through mismanagement or negligence of the lessees. *Held,* that the contract was not sale, but a bailment.[1]

Appeal from District Court, First District; W. H. Maughan, Judge.

Action by John Y. Rich against the Utah Commercial and Savings Bank. From the judgment, defendant appeals.

Affirmed.

*J. H. Moyle* for appellant.

*Street & Bramel* for respondent.

### APPELLANT'S POINTS.

When there has been such an intermixture of goods owned by different persons that the property of each can no longer be distinguished, what is denominated a confusion of goods has taken place. (*Hesseltine v. Stockwell,* 30 Me. 237, 50 Am. Dec. 627.)

The doctrine of confusion of goods will not be carried further in any case than necessity and justice requires. (*Brown v. Bacon,* 63 Texas 595; *Claffin v. Beaver,* 55 Fed. 576.)

It involves a forfeiture, and is never applied where it consistently can be avoided. (*Keweenaw Assn. v. O'Neil,* 120 Mich. 270, 79 N. W. 186.)

It must be an extreme case that will justify the taking of the property of one person and giving it to another; whenever it is possible, therefore, to make a division of the prop-

[1] Wetzel v. Bank, 30 Utah 62, 83 Pac. 570; Woodward v. Edmunds, 20 Utah 118, 57 Pac. 848; Turnhow v. Beckstead, 25 Utah 468, 71 Pac. 1062.

erty and give to each one his share, a court will make such division. (*Bank v. Scott,* 36 Neb. 607, 54 N. W. 987.)

And no one has a right to take the whole, but in so doing commits a trespass on the other owner. He should notify him to make a division, or to take his own proportion at his peril taking care to leave to the other owner as much as belongs to him. (*Hart v. Morton,* 44 Ark. 447; *Wingate v. Smith,* 20 Me. 287; *Ryder v. Hathaway,* 38 Mass. [21 Pick.] 298; *Wetherbee v. Green,* 22 Mich. 311, 7 Am. Rep. 653; *Keweenaw Assn. v. O'Neil,* 120 Mich. 270, 79 N. W. 183; *Davis v. Krum,* 12 Mo. App. 279; *Pickering v. Moore,* 67 N. H. 533, 32 Atl. 828; *Pratt v. Bryant,* 20 Vt. 333; *Brown v. Bacon,* 63 Tex. 595.)

Moreover, the rule that one may lose his own property by mixing it with the property of another, applies only to cases where the property of one cannot be distinguished fom that of the other, after the mixture. (*Baldwin v. Porter,* 12 Conn. 473, 483; *Frost v. Willard,* 9 Barb. 440; *Holbrook v. Hyde,* 1 Vt. 286.)

There is no forfeiture if the goods are of such a character that the property of each can be identified and separated. (*Capron v. Porter,* 43 Conn. 383; *Claffin v. Continental Jersey Works,* 85 Ga. 11 S. E. 721; *Moore v. Bowman,* 47 N. H. 494.)

And this is true although the intermixture was fraudulent. (*Allen v. Kirk,* 81 Iowa 658, 47 N. W. 906; *Claffin v. Bearer,* 55 Fed. 576; *Clafin v. Jersey Works,* 85 Ga. 27, 11 S. E. 721; *Reid v. King,* 89 Ky. 388, 12 S. W 722; *Gilman v. Hill,* 36 N. H. 311; *Sims v. Glazener,* 14 Ala. 695, 48 Am. Dec. 120; *Muse v. Lehman,* 30 Kan. 514, 1 Pac. 804; *Stone v. Quaal,* 36 Minn. 46, 29 N. W. 326; *Kaufman v. Schilling,* 58 Mo. 218; *Adams v. Meyers,* 1 Saw. 306; Fed. Case No. 62.)

When a person mingles his goods with those of others innocently or by mistake, if he can show their value or their proportion of the value to the whole, he should be allowed to do so, and his property should not be forfeited. (*Clafin v. Jersey Works,* 85 Ga. 27, 11 S. E. 721.)

When the goods of two or more persons are, by consent, intermixed so that they can no longer be distinguished, the owners have an interest in common in proportion to their respective shares. In such a case the relation of the parties is that of contract, and the presumption arises that they agreed to hold the mass as tenants in common. This doctrine finds frequent application where grains are intermixed. (*Low v. Martin*, 18 Ill. 286; *Van Liew v. Liew*, 36 N. J. Eq. 637, 641. *Inglebright v. Hammond*, 19 Ohio 337, 53 Am. Dec. 430; *Spencer v. Marine Ins. Co.*, L. R. 3 C. P. 437; *Jones v. Moore*, 4 Younge & C. 351; *Belcher v. Livestock Commission Co.*, 26 Tex. Civ. App. 60, 62 S. W. 924; *Dole v. Olmstead*, 36 Ill. 150, 85 Am. Dec. 397; *Drudge v. Leiter*, 18 Ind. App. 694, 43 N. E. 34; *Arthur v. Railroad*, 61 Iowa 648, 17 N. W. 24; *Hall v. Pillsbury*, 43 Minn. 33, 44 N. W. 683; *Bank v. Scott*, 36 Neb. 607, 54 N. W. 987; *Inglebright v. Hammond*, 19 Ohio 337, 53 Am. Dec. 430; *Leonard v. Belknap*, 47 Vt. 602.)

Where a party receiving property is at liberty to return another thing of equal value, either in the form of money or otherwise, he becomes a debtor to make the return, the title to the property is changed, and the transaction is a sale. This is the universal rule sustained by an overwhelming array of authorities. (*Carpenter v. Briffin*, 9 Paige Ch. [N. Y.] 309; *Hurd v. West*, 7 Cowen 752; *Fosdick v. Greene*, 27 Ohio St. 484; *Chase v. Washburn*, 1 Ohio St. 244; *Carlisle v. Wallace*, 12 Ind. 252; *Richardson v. Olmstead*, 74 Ill. 213; *Johnson v. Browne*, 37 Iowa 200; *Chickering v. Bastress*, 130 Ill. 309, 17 Am. St. Rep. 309; *Lonergan v. Stewart*, 55 Ill. 44; *Rahilly v. Wilson*, 3 Dill. 420; *McKay v. Hamblin*, 40 Minn. 472; *Foster v. Pittibone*, 7 N. Y. 433; *Brown v. Hitchcock*, 28 Vt. 542; Story on Bailments, sec. 37, 415; Schouler on Personal Property, sec. 38, 39; *Lonergan v. Stewart*, 55 Ill. 44; *Hurd v. West*, 7 Cowen 752; *Newton v. Woodruff*, 2 Comstock 153; *Ewing v. French*, 1 Blackf. 353; *Hurd v. West*, 7 Cowen 752; *Smith v. Clark*, 21 Wendell 83, Am. Dec. 213; *Norton v. Woodruff*, 2 N. Y. 153; *Mallory v. Willis*, 4 N. Y. 77.)

RESPONDENT'S POINTS.

The findings will not be disturbed if supported by any evidence.

In *Walley v. Bank,* 14 Utah 313, the Court says: "As the appeal brings up the questions of law alone, and as there is some evidence in the record tending to sustain the finding, we do not feel satisfied to disturb the finding on this subject." (*Whittaker v. Ferguson,* 16 Utah 242.)

The same principle is announced and affirmed in *Thompson v. Whitney,* 20 Utah 1; *Smith v. Droubay,* 20 Utah 443; *Watson v. Mining Co.,* 24 Utah 222; *Garr v. Cranney,* 25 Utah 193; *Clark v. Ducheneau,* 26 Utah 97; *Burt v. Power Co.,* 26 Utah 157; *Copley v. Ry. Co.,* 26 Utah 361; *Pottery Co. v. White,* 27 Utah 236; *Gibson v. Milner,* 28 Utah 438; *Tuckfield v. Crager,* 29 Utah 472, 82 Pac. 860.

An owner of logs, upon which there is a lien, cannot defeat a foreclosure upon the ground that other logs having the same brand have been commingled therewith by him. (*Creighton v. Cole,* 38 Pac. 1007; *Williams v. Geiger,* 40 Pac. 616; *Hawkins v. Mining Co.,* 33 Pac. 40.)

But the court undoubtedly was of the firm opinion that no commingling of the "American Fork" sheep with plaintiff's sheep ever occurred, for the simple reason that there never was a herd of "American Fork" sheep to commingle with.

The Supreme Court of Utah has held in numerous cases that conditional sales, agreements retaining title, etc., are valid. (*Lippincott v. Rich,* 19 Utah 140; *Laundry Co. v. Dole,* 22 Utah 311.)

STRAUP, J.

1. This is an action brought by respondent against appellant for the conversion of sheep. The court found that the appellant, at the county of Bannock, in the state of Idaho, converted 853 sheep, the property of respondent, and entered judgment in his favor for their value. The first assignment of error relates to the refusal of the court to strike

the testimony of several witnesses who testified to the value of the sheep. The direct examination showed that the witnesses were sheep men, and for years had been in the sheep business; they testified that they knew the market value of sheep in Utah and Idaho at the time of the conversion; some of them knew and were acquainted with the sheep in question; and some of them also testified that the market value of the sheep in Utah and Idaho was determined by the market reports and prices as made and obtained at the river, and in Chicago. On cross-examination these witnesses testified that they did not know of any sales having been made at Soda Springs, at or about the time in question, and some of them, that they also knew the value of the sheep by inquiring as to their value at that time. A motion was made by appellant to have the testimony of these witnesses stricken, because of their incompetency to testify to the market value. The motion was properly overruled.

2. It is further claimed by the appellant that the evidence was not sufficient to support the finding that the sheep, alleged to have been converted by it, were the property of respondent; but, to the contrary, it is asserted by it that the evidence shows that the sheep were the property of Clark and Naylor, who had given appellant a chattel mortgage, by virtue of which appellant seized and sold the sheep. The undisputed evidence shows that in October, 1901, J. M. Jenson and Berham Hunsaker, at Brigham City, Utah, were the owners of 8,000 sheep, then in Box Elder county, Utah, which were leased by them to Clark and Naylor, and to Naylor's father and brothers. Clark and Naylor received, as some of the witnesses say, 4,000, others about 3,500 of the sheep, and the remainder were taken by Naylor's father and brothers. The sheep thus were divided into two herds, and were ranged separately. In the summer of 1902 Naylor's father and brothers returned to Hunsaker the sheep received by them, and Hunsaker from thence on ceased to have any further interest in the leased sheep. At about the same time Jenson sold all his interest in and to the leased sheep to respondent Rich. The sheep delivered to Clark and Naylor

were ranged by them the following season in Box Elder coun-
ty, except about 890 head, which were taken by them to
Tooele county. It is claimed by the appellant that at that
time, Clark and Naylor, at the county of Tooele, had about
900 sheep of their own, whilst it is claimed by the respond-
ent, that the sheep so claimed by Clark and Naylor were the
property of Wilson and Sherman, also leased to Clark and
Naylor. In the spring of 1902 Clark and Naylor drove the
leased sheep ranged by them in Box Elder county, the sheep
taken to Tooele county, the Wilson and Sherman sheep or
their own sheep, to East Canyon, Summit county, where
they were all mixed; and, as some of the witnesses say, inten-
tionally, on the part of Clark and Naylor. In the fall of
1902 all the sheep were taken to Skull Valley for winter. Up
to this time Clark and Naylor had lost a good many sheep
by death, and otherwise. In October, 1902, Clark and Nay-
lor borrowed from appellant $2,500, for which they gave
their note secured by chattel mortgage on 2,200 head of
sheep branded "W" and "C," and claimed to be owned by
them. On January 7, 1903, Clark and Naylor borrowed
from appellant an additional $775, for which they gave their
note secured by mortgage on 500 head of ewes, and upon all
of the sheep claimed to be owned by them, not included in
the prior mortgage. In the spring of 1903 about 500 head
of sheep were taken from the herd without reference to the
mortgages or the lease, and were left in Salt Lake county
in the custody of Mat Cochrane, and, as some of the evidence
tends to show, for Wilson and Sherman. The balance of all
the sheep, now consisting of about 1,800 head, were loaded
on cars at Tooele county and shipped to Soda Springs,
Idaho, where they were grazed during the spring and sum-
mer of 1903. In the fall of that year Clark and Naylor sold
and shipped all the fat and marketable sheep, including the
ewes, to Chicago, and left only about 850 sheep with which
to satisfy respondent's claim of 3,500 or 4,000 sheep togeth-
er with the natural increase, and 2,700 head mortgaged to ap-
pellant. Appellant now claims that this remnant of 850 sheep
were the sheep originally owned by Clark and Naylor and

were no part of the herd of sheep leased by them from Hunsaker and Jenson.   There is much evidence in the record showing that these sheep were of the herd leased by Clark and Naylor from Hunsaker and Jenson.   Speaking of these sheep, the witness Hunsaker testified: "I saw the sheep at Soda Springs, Idaho.   We counted them, and I know that it was 850 some odd head. They were about the same quality of sheep that were turned over.   They were ewes and lambs. We went out to examine them for Mr. Rich. We bunched the sheep and caught them.   They had the brand that Clark and Naylor were supposed to brand them with.   Clark and Naylor were supposed to brand the sheep of Jenson and Hunsaker.   They were branded with a red cent mark (c).   It is a cent mark with a stroke through it.   All the sheep had that brand on them.   Every ear mark that we had in the herd that I could remember when we turned the sheep over to Clark and Naylor I found among those sheep."   Joseph M. Jenson, Jr., testified:

"I knew the sheep turned over to Clark and Naylor.   I never saw the sheep afterwards excepting a part of them which I saw in the spring of the year 1903, at Black Rock, and they were the same sheep that my father and Hunsaker turned over.   The sheep were on the range and scattered. We bunched them and went through them.   I think we counted about 632 ewes and 220 lambs.   And then we began to catch them to see if we could find earmarks.   The brand on all those sheep was "C" with a line through it. We found the wool brand on all the sheep and the lambs which we examined, which is found in the lease."

Other evidence of similar character, tending to show that the sheep in question were of the herd leased by Hunsaker and Jenson to Clark and Naylor, was also given in behalf of respondent.   This evidence unquestionably is sufficient to support the finding.   It is true that Clark and Naylor testified that at the time they leased the sheep from Hunsaker and Jenson they owned sheep of their own which they claimed they had purchased from a man named Jenson, whose first name they could not remember, nor could they remem-

ber when they bought the sheep, nor could they even state approximately how many they bought. They claimed they also branded these sheep with a "c." They testified that they mixed the sheep leased by them from Hunsaker and Jenson and those leased from Wilson and Sherman with their own, and that they were all shipped to Soda Springs, except about 400, but how many they shipped to Soda Springs they were unable to state; that the sheep were ranged at Soda Springs; and that they sold and shipped some sheep to Chicago. They were unable to state what marks or brands were upon the sheep so sold and shipped by them, did not know how many they had sold, could not state how much they had received for them, and could not even state these matters approximately. They stated that the sheep so sold and shipped were taken from the herd without reference as to whether they were respondent's sheep or the sheep mortaged by them to appellant, and they were unable to state from which they had taken the greater percentage; but one of them stated that it was his best judgment that none of respondent's sheep were shipped to Chicago. While they admitted receiving money for the sale of sheep, in portions of their testimony, they said that they could not approximate how much it was, and in other portions they declined to state how much it was, but admitted that none of the money so received by them was paid to either the appellant or the respondent. This kind of testimony, as against the direct evidence upon behalf of respondent, does not even raise a substantial conflict. We think that the trial court was not only justified in making the finding that was made; but that the evidence did not fairly warrant any other or different finding. From the evidence the fact might well be found that Clark and Naylor did not own any sheep; that all the sheep in their possession were leased sheep, and that the sheep mortgaged by them were the sheep leased by Hunsaker and Jenson.

3. It is further urged that the transaction between Hunsaker and Jenson and Clark and Naylor constituted a sale of sheep and not a bailment. The agreement between the part-

ies upon its face purports to be a lease, and, among other things, expressly provides that the title of the sheep and their increase shall remain in Hunsaker and Jenson, the lessors; that Clark and Naylor are to keep and care for the sheep from October, 1901, to October, 1904, when they were to be returned to the lessors, as by the terms of the lease provided; provision was made in the lease as to the kind of brand with which the herd was to be branded; the lessees agreed to return to the lessors the number of sheep received by the lessee, and in the same condition, grade, quality and age; and the lessees agreed to pay, as rental for said sheep, two pounds of wool per year and 12 lambs per hundred; that the agreement was a personal contract to the lessees, and that they could not assign or transfer it, in any way, without the consent of the lessors. The lease further provided that in the event the lessors, in good faith, believed that their interests were being jeopardized, through mismanagement or negligence of the lessees, the lessors had the right to take possession of all the sheep. The agreement has no essential of a sale, but has all the essentials of a bailment, and in this particular the case is controlled by *Wetzel v. Bank,* 30 Utah 62, 83 Pac. 570; *Woodward v. Edmunds,* 20 Utah 118, 57 Pac. 848, and *Turnbow v. Beckstead,* 25 Utah 468, 71 Pac. 1062.

The judgment of the court below is affirmed, with costs.

BARTCH, C. J., and McCARTY, J., concur.